**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiffs,*
*FLSA Collective Plaintiffs,*
*and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SHERMAN RIVERO and CARLOS MANUEL VARGAS,
*on behalf of themselves, FLSA Collective Plaintiffs,*
*and the Class,*

                    Plaintiff,

        v.

GLENCO CONTRACTING GROUP INC,

                    Defendant.

Case No.:

**CLASS AND COLLECTIVE ACTION COMPLAINT**

Jury Trial Demanded

---

Plaintiffs, SHERMAN RIVERO and CARLOS MANUEL VARGAS ("Plaintiffs"), on behalf of themselves and others similarly situated, by and through their undersigned attorneys, hereby file this Class and Collective Action Complaint against Defendant GLENCO CONTRACTING GROUP INC ("Defendant") and states as follows:

<u>**INTRODUCTION**</u>

1.      Plaintiffs allege, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§201 *et. seq.* ("FLSA"), that they and others similarly situated are entitled to recover from Defendant: (1) unpaid wages, including overtime, due to time-shaving; (2) liquidated damages; and (3) attorneys' fees and costs.

2.      Plaintiffs further allege that, pursuant to the New York Labor Law ("NYLL"), they and others similarly situated are entitled to recover from Defendant: (1) unpaid wages, unpaid overtime, due to time-shaving; (2) statutory penalties; (3) liquidated damages; and (4) attorneys' fees and costs.

3.      Defendant GLENCO CONTRACTING GROUP INC operates a construction company, specializing in foundation work & superstructure concrete work, masonry, concrete renovations & restorations throughout New York State. Plaintiffs, potential collective members, and putative class members are current and former non-exempt construction workers of Defendant, who were all victims of Defendant's schemes to avoid paying employees for all their work hours. Specifically, despite requiring employees to clock-in-and-out on a tablet each day, Defendant rounded down, one directionally, employees' punch-times.  Plaintiffs also allege that Defendant would automatically deduct for 30 minute meal breaks even though most meal breaks actually lasted about ten (10) minutes before employees were instructed to go back to work.

4.      Plaintiff SHERMAN RIVERO brings additional claims, on behalf of himself and a subclass of employees, pursuant to the New York State Human Rights Law, New York Executive Law § 296 ("NYSHRL") and the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 ("NYCHRL"), due to the deprivation of his and subclass members' statutory rights caused by Defendant's (1) discrimination due to (i) their immigration and citizenship statuses, in violation of the NYSHRL and NYCHRL, and (ii) their perceived alienage and citizenship statuses, in violation of NYCHRL, and (2) retaliation against Plaintiff SHERMAN RIVERO and subclass members.   Plaintiff SHERMAN RIVERO brings claims due to the actions of Defendant's supervisor who discriminatorily targeted the putative subclass and demanded the putative subclass pay them $200 each week under the continuous threat of retaliatorily terminating

their employment.  While most of these payments were in cash, some employees used applications such as "Zelle" to distribute these payments to managers. Examples of an employee's payments to his supervisor are attached hereto as **Exhibit A**. Not only did Defendant's supervisor perpetrate this unlawful, discriminatory and retaliatory practice against subclass members, many subclass members reached out to other managerial employees of Defendant for protection to no avail.  For this violation of the NYSHRL and NYCHRL, Plaintiff SHERMAN RIVERO seeks to recover on behalf of himself and the subclass: (1) economic damages, (2) compensatory damages, (3) punitive damages, (4) damages for egregious emotional distress, and (5) attorneys' fees and costs.

5.      Plaintiff RIVERO brings further claims, on behalf of himself and a subclass of employees, under the FLSA and the NYLL, for Defendant's retaliation against Plaintiff RIVERO and subclass members for asserting their protected rights under the FLSA and the NYLL, and seeks to recover (1) economic damages, (2) compensatory damages, (3) punitive damages, and (4) attorneys' fees and costs.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this controversy pursuant to 29 U.S.C. § 216(b), 28 U.S.C. §§ 1331, 1337 and 1343 and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in the Southern District pursuant to 28 U.S.C. § 1391 as the material events giving rise to this action occurred in New York County.

## PARTIES

8.      Plaintiff SHERMAN RIVERO is a resident of Queens County, New York.

9.      Plaintiff CARLOS MANUEL VARGAS is a resident of Bronx County, New York.

10.     Defendant GLENCO CONTRACTING GROUP INC is a domestic business

corporation organized under the laws of the State of New York with an address for service of process located at c/o Global Virtual Agent Services, Inc, 1 East High Street, Ballston Spa, NY 12020.

11.    At all relevant times, Defendant was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA and the NYLL and the regulations thereunder.

12.    At all relevant times, the work performed by Plaintiffs, FLSA Collective Plaintiffs, and Class Members was directly essential to the business operated by Defendant.

## FLSA COLLECTIVE ACTION ALLEGATIONS

13.    Plaintiffs bring claims for relief as a collective action pursuant to FLSA Section 16(b), 29 U.S.C. § 216(b), on behalf of all non-exempt construction workers, including general laborers, foremen, rebar workers, cement layers, and carpenters, employed by Defendant on or after the date that is six (6) years before the filing of the Complaint in this case as defined herein ("FLSA Collective Plaintiffs").

14.    At all relevant times, Plaintiffs and FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendant's decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay them their proper wages, including overtime, due to time shaving. The claims of Plaintiffs stated herein are essentially the same as those of FLSA Collective Plaintiffs.

15.    The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to § 16(b) of the FLSA, 29 U.S.C. § 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendant. Notice can be provided to the

FLSA Collective Plaintiffs via first class mail to the last address known to Defendant.

## RULE 23 CLASS ALLEGATIONS

16.     Plaintiffs bring claims for relief pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of all non-exempt construction workers including general laborers, foremen, rebar workers, cement layers, and carpenters, employed by Defendant on or after the date that is six (6) years before the filing of the Complaint in this case as defined herein (the "Class" or "Class Members").

17.     The Class Members are readily ascertainable. The number and identity of the Class Members are determinable from the records of Defendant. The hours assigned and worked, the position held, and rates of pay for each Class Member are also determinable from Defendant's records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendant. Notice can be provided by means permissible under F.R.C.P. 23.

18.     The Class also includes a subclass of employees, all of whom were Non-U.S. Citizens and Non-Green card holders, employed by Defendant as general laborers, cement workers, rebar workers, and/or carpenters, and worked for Defendant's under the supervisor/manager Santiago Alvarez (the "Subclass" or "Subclass Members"). Plaintiff SHERMAN RIVERO is both a member of the Class and Subclass. Supervisor/manager Alvarez subjected every member of the Subclass to the same unlawful discriminatory policies.

19.     The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown, the facts on which the calculation of that number are presently within the sole control of Defendant, there is no doubt that there are more than forty

members of the Class.  There are also over forty members of the Subclass.

20.    Plaintiffs' claims are typical of those claims which could be alleged by any member of the Class, and the relief sought is typical of the relief which would be sought by each member of the Class in separate actions. All the Class Members were subject to the same corporate practices of Defendant, as alleged herein, of: (i) failing to pay wages, including overtime, due to time shaving; (ii) failing to provide wage and hour notices, at date of hiring and annually, per requirements of the NYLL; and (iii) failing to provide proper wage statements per requirements of the NYLL.

21.    Plaintiff SHERMAN RIVERO's claims are also typical of the Subclass. Defendant's business typically operates four (4) construction sites at any one time.  Each site employs fifty-five (55) to eighty (80) employees, all managed under a single supervisor.  Subclass Members, who were all managed under the supervisor Santiago Alvarez, were victims of Mr. Alvarez's discriminatory conduct.  Defendant's supervisor Santiago Alvarez would demand that Subclass Members each pay him or a designee $200.00 from their paycheck every week, on threat of firing. Subclass Members were forced to pay either Mr. Alvarez or his designee in cash or by electronic means, such as "Zelle" which permits transfer of funds in much the same manner as Venmo. Plaintiff SHERMAN RIVERO paid the $200.00 weekly fee to keep his job, with Plaintiff RIVERO paying Santiago Alvarez or his designee via Zelle each week.  *See* **Exhibit A**.  This requirement was only forced on Subclass Members as a result of their immigration and citizenship statuses and/or their perceived status, and U.S. Citizens and Green card holders were never required to make these payments to keep their jobs.  This practice effected all Subclass Members equally.

22.    Defendant's corporate-wide policies and practices affected all Class Members similarly, and Defendant benefited from the same type of unfair and/or wrongful acts as to each

Class Member. Plaintiffs and other Class Members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

23.    Plaintiffs are able to fairly and adequately protect the interests of the Class and have no interests antagonistic to the Class. Plaintiffs are represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

24.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of the wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because losses, injuries and damages suffered by each of the individual Class members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendant and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided

by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

25.     Defendant and other employers throughout the state violate the NYLL. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the Complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

26.     There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including:

      a)  Whether Defendant employed Plaintiffs and Class Members within the meaning of the NYLL;

      b)  What were and are the policies, practices, programs, procedures, protocols and plans of Defendant regarding the types of work and labor for which Defendant did not pay Plaintiffs and the Class Members;

      c)  At what common rate, or rates subject to common methods of calculation, was and are Defendant required to pay Plaintiffs and Class Members for their work;

      d)  Whether Defendant properly notified Plaintiffs and Class Members of their hourly rate and overtime rate;

      e)  Whether Defendant paid Plaintiffs and Class Members proper wages for all hours worked, including overtime hours;

f)  Whether Defendant caused time shaving by paying Plaintiffs and Class Members only for those hours which they were scheduled to work, rather than for the actual hours that they worked;

g)  Whether Defendant paid Plaintiffs and Class Members their lawful wages in a timely manner;

h)  Whether Defendant provided wage and hour notices to Plaintiffs and Class Members, at date of hiring and annually, per requirements of the NYLL;

i)  Whether Defendant provided proper wage statements to Plaintiffs and Class Members per requirements of the NYLL; and

j)  Whether Defendant's managers discriminated and retaliated against Plaintiff SHERMAN RIVERO and Subclass Members due to their citizenship and immigration statuses.

## **STATEMENT OF FACTS**

*Plaintiffs', FLSA Collective Plaintiffs', and Class Members' Wage Claims:*

27.     In or around January 2023, Plaintiff RIVERO was hired by Defendant's manager Santiago Alvarez to work as a Laborer/Carpenter for Defendant. During Plaintiff RIVERO's employment, Plaintiff RIVERO worked for Defendant in multiple job sites throughout New York City, including the following locations: (i) 2nd Avenue and 83rd street, (ii) Manhattan Avenue in Brooklyn, and (iii) 204 4th Avenue. Plaintiff RIVERO's employment with Defendant terminated in or around October 2023.

28.     During Plaintiff RIVERO's employment, Plaintiff RIVERO was scheduled to work five (5) days per week.  Each day was scheduled to begin at 7:00 am and scheduled to end at 3:30 pm, with a thirty (30) minute lunch break automatically deducted from employees' wages. At all

times, Plaintiff RIVERO was compensated by Defendant at an hourly rate of $28.00 per hour. Plaintiff RIVERO worked his scheduled hours, plus additional hours that went uncompensated by Defendant.

29.    In or around January 2020, Plaintiff VARGAS was hired by Defendant to work as a foreman for Defendant. During Plaintiff VARGAS's employment, he worked in approximately seven (7) different job sites throughout the city.   Each location of employment involved the construction of a high-rise building typically over twenty-five (25) floors or more, and each job lasted about six (6) to seven (7) months.   Plaintiff VARGAS's employment with Defendant terminated in or around August 2023.   While Plaintiff VARGAS was a foreman, he was not empowered by Defendant to hire, fire, set schedules, set pay, or discipline.

30.    During Plaintiff VARGAS's employment, Plaintiff VARGAS was scheduled to work five (5) days a week.  Each day was scheduled to begin at 7:00 am and scheduled to end at 3:30 pm with a thirty (30) minute lunch break automatically deducted from employees' schedules. Plaintiff VARGAS worked his scheduled hours, plus additional hours that went uncompensated by Defendant.

31.    From the beginning of his employment until in or around January 2022, Plaintiff VARGAS was compensated by Defendant at an hourly rate of forty-five dollars ($45.00) per hour. From in or around January 2022 to the end of his employment, Plaintiff VARGAS was compensated by Defendant at an hourly rate of fifty-eight dollars ($58.00) per hour and eighty-seven dollars ($87.00) an hour for overtime hours.

32.    FLSA Collective Plaintiffs and Class Members were scheduled to work similar hours as Plaintiffs each week.  At all times, Plaintiffs, FLSA Collective Plaintiffs and Class Members worked hours in excess of their scheduled hours for which they were not compensated,

resulting in Defendant undercompensating each employee for each shift.

33.    Plaintiffs', FLSA Collective Plaintiffs', and Class Members' underpayments began at the start of the day.  Approximately fifty-five (55) to eighty (80) Class Members worked at each job site with most employees arriving and leaving each job site at similar hours.  However, despite employees needing to clock-in and out at around the same time, each job site only maintained one clock-in device.  Every employee would have to line-up, oftentimes around the block, to clock-in.  If Plaintiffs, FLSA Collective Plaintiffs, and Class Members, clocked in early, their clock-in times would be rounded to their scheduled times.  When Plaintiffs, FLSA Collective Plaintiffs, and Class Members clocked-in even a few minutes late, *their clock in times were rounded-up to the nearest thirty (30) minute mark*.  Because employees had to line up around the block to clock-in, even employees arriving early would be unable to clock-in by their schedule and would have their compensable time rounded over thirty minutes to their detriment.

34.    The above rounding violation deprived each Plaintiff of at least one (1) hour of compensation each week. While the above morning rounding violation resulted in unpaid overtime in other weeks not delineated here, Plaintiffs list at least the following specific weeks where an overtime violation occurred: for Plaintiff RIVERO for the weeks ending on August 1, 2023, and October 10, 2023.  FLSA Collective Plaintiffs and Class Members were deprived similar compensation due to this morning rounding.

35.    Again, in the afternoon, employees' times were rounded to the nearest thirty minute mark, to their detriment.  When employees clocked out a few minutes before 3:30 pm (a typical end time), their clock-out time was rounded down to 3:00 pm.  Further, when clocking-out between 3:30 pm and 3:59 pm, their clock-out time was rounded down to 3:30 pm.

36.    The above afternoon rounding violation deprived each Plaintiff of at least one (1)

11

hour of compensation each week.  While the above afternoon rounding violation resulted in unpaid overtime in other weeks not delineated here, Plaintiffs list at least the following specific weeks where an overtime violation occurred: for Plaintiff RIVERO for the weeks ending on August 1, 2023, and October 10, 2023.  FLSA Collective Plaintiffs and Class Members were deprived similar compensation due to this afternoon rounding.

37.     Plaintiffs, FLSA Collective Plaintiffs, and Class Members all suffered an automatic thirty-minute deduction for a lunch break.  However, lunch breaks never lasted longer than fifteen (15) minutes, with most lasting only ten (10) minutes.

38.     The above automatic deduction for meal-breaks deprived each Plaintiff of two-and-one-half (2.5) hours of compensation each week.  While the above automatic meal-break violation resulted in unpaid overtime in other weeks not delineated here, Plaintiffs list the following specific weeks where an overtime violation occurred: for Plaintiff RIVERO for the weeks ending on August 1, 2023, and October 10, 2023.  FLSA Collective Plaintiffs and Class Members were deprived similar compensation due to automatic deductions of meal-breaks that they never received.

39.     The above rounding and improper meal-break deduction occurred regardless of the supervisor or job site.

40.     Plaintiff VARGAS makes an individual allegation, that Defendant would often go beyond the above impermissible rounding and auto-meal-break-deductions, and would manually adjust his hours, in some weeks as much as 8 hours, to his detriment.  When he asked why this occurred, management stated that he clocked-in too early or stayed too late, without prior authorization.  Plaintiff VARGAS was a foreman working under each job site's supervisor and would be required to engage in pre-and-post shift work, which often meant clocking-out after

others had finished work for the day. As Plaintiff VARGAS had to open the site, lock the site down, and perform final inspections at the end of the day, he would often work additional hours for the benefit of Defendant. If Defendant deemed Plaintiff VARGAS's hours to be excessive, they would manually adjust his hours down.

*Plaintiffs' and Class Members' Wage Theft Prevention Act Claims:*

41.    Plaintiffs and Class Members never received wage notices accurately stating their base rate of hourly pay from Defendant. They also did not receive wage statements from Defendant accurately stating their base rate of hourly pay, overtime rate, or hours worked.

42.    In violation of the Wage Theft Protection Act ("WTPA")—incorporated into NYLL—Defendant knowingly and willfully operated their business with a policy of not providing accurate wage notices, stating employees' true base rate of hourly pay, to Plaintiffs and Class Members at the beginning of their employment with Defendant.

43.    Defendant further violated the WTPA by failing to provide Plaintiffs and Class Members with accurate wage statements, because wage statements that do not reflect the actual number of hours worked by the employee do not satisfy the requirements of the WTPA. *See Shi Yong Li v. 6688 Corp.*, 2013 U.S. Dist. LEXIS 148020, *6 (S.D.N.Y. Sept. 27, 2013) ("The wage statements provided failed to accurately indicate the amount of time *actually* worked by tipped employees") (emphasis added); *Copper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460, 468 (E.D.N.Y. 2015) (holding that "the 'number of overtime hours' that appears on the wage statement should include every hour *actually* 'worked' by the employee") (emphasis added); *Campos v. Bkuk 3 Corp.*, 2021 U.S. Dist. LEXIS 151528, *30 (S.D.N.Y. Aug. 10, 2021) ("Thus, when paystubs were received, they were not accurate insofar as they did not accurately reflect the hours *actually* worked") (emphasis added).

44.     In failing to provide proper wage statements and notices, Defendant has failed to comply with the law in a manner that entails a concrete harm to an interest identified by the New York State legislature. As many Courts have observed, when paired with allegations of underpayments, the harm generated from the failure to provide such accurate notices and statements, is obvious on its face:

> Denying an employee such notices—as alleged here—can impinge on an employee's interests not only in being paid what is owed, but also in being able to advocate for the receipt of proper pay. The Court thus finds that, by alleging that they were not furnished the statutorily required notices, plaintiffs have asserted a concrete and particularized injury sufficient to confer standing for their WTPA wage notice and wage statement claims. Consistent with this, multiple courts in this District have exercised jurisdiction over such claims, without requiring a specific showing as to the downstream impact on the plaintiff of the non-provision of the required notice.

*Bueno v. Buzinover*, 2023 U.S. Dist. LEXIS 38154, *5-6 (S.D.N.Y. 2023) (Judge Paul A. Engelmayer) (collecting cases)

> The wage statement and notice violations alleged here are of a different class of harm than those alleged in *TransUnion* and *Maddox*. The WTPA was enacted to "protect an employee's concrete interest in being paid what he or she is owed under the NYLL." *Bueno*, 2023 U.S. Dist. LEXIS 38154, 2023 WL 2387113, at *3 (quoting *Imbarrato v. Banta Mgmt. Servs. Inc.*, No. 18 CV 5422, 2020 U.S. Dist. LEXIS 49740, 2020 WL 1330744, at *8 (S.D.N.Y. Mar. 20, 2020)). Specifically, the WTPA's wage notice and wage statement provisions are intended to serve as safeguards of employees' broader interest in being paid the wage they are owed. *Bueno*, 2023 U.S. Dist. LEXIS 38154, 2023 WL 2387113, at *3.

> Here, although the plaintiffs' wage statement and notice claims allege only the bare assertion that they never received their statutorily required wage statements and notices, the realization of the downstream harm the statute seeks to prevent—wage theft—is evident on the face of the pleadings. Had the sole allegation been one of failure to furnish statutorily mandated notices and statements absent the companion allegations of wage theft, plaintiffs may have encountered an issue of standing. But that is not the case here. The plaintiffs in this case allege a years-long practice of failing to pay proper wages, a pattern that was undoubtedly buttressed by their employer's failure to comply with the wage statement and notice provisions of the WTPA, which were designed to prevent this precise form of wage theft by informing employees of their pay rates and deductions.

*Bello v. Pro-Line Pumping Corp.*, 2023 U.S. Dist. LEXIS 106676, *27-29 (E.D.N.Y. 2023) (Judge Robert Levy); *report and recommendation adopted, Bello v. Pro-Line Pumping Corp.*, 2023 U.S. Dist. LEXIS 125632 (E.D.N.Y. 2023) (Judge Rachel P. Kovner).

45.    Other Courts have found standing exists where a plaintiff alleges that the failure to provide proper wage notices and statements resulted in one of the following: (i) delayed payment of all proper wages, (ii) deprived employees of the ability to immediately contest wage calculations, (iii) misled and/or confused employees as to their hours worked or rates of pay, and/or (iv) the inaccurate or absent wage notice and wage statements prevented employees from realizing the extent of their underpayments. *See e.g., Lipstein v. 20X Hospitality LLC*, 2023 WL 6124048, at *9 (S.D.N.Y. Sept. 19, 2023) (Judge Jennifer L. Rochon) (finding standing where plaintiff alleged that the lack of wage notices and wage statements kept him from realizing that he was being underpaid and thereby preventing him from taking appropriate action to obtain the payments due to him); *Metcalf v. TransPerfect Translations International, Inc.*, 2023 WL 2674743, at *6 (S.D.N.Y. Mar. 29, 2023) (Judge Edgardo Ramos) (finding standing where plaintiffs alleged that inaccurate wage notices and wage statements prevented them from knowing whether, and to what extent, they had been underpaid).

46.    Here, as in the cases described above, Defendant's failure goes beyond generating a risk of harm to Plaintiffs and Class Members. Defendant's conduct actually harmed Plaintiffs and Class Members. Defendant's failure to provide wage notices and paystubs listing all hours actually worked and rates of pay including overtime hours and overtime rates due to the wage violations described above, deprived employees of the ability to contest the pay provided by Defendant, allowed Defendant to hide their wrong-doing, necessitated the current litigation to vindicate Plaintiffs' and Class Members' rights, and delayed Plaintiffs' and Class Members' retention of complete compensation. This conduct ensured Defendant's ability to further delay

providing proper compensation to low wage earners entitled to protection under federal and state law. Defendant's failure to provide wage notices and wage statements to employees allowed Defendant to hide their responsibility and deprive employees of timely compensation.

47.     Had the wage statements Defendant provided to Plaintiffs and Class Members accurately listed the correct base rate of pay and total number of hours Plaintiffs and Class Members actually worked, as required by law, Defendant would have had to either (a) increase the wages to correspond to the hours employees actually worked or (b) forthrightly acknowledge, by way of the wage statement, that the employees' wages did *not* correspond to the hours the employees actually worked. Either possibility would have allowed Plaintiffs and Class Members to immediately vindicate their rights under the NYLL. The deprivation of these possibilities therefore constitutes an injury as does the delay in receiving payment caused by them.

48.     The failure to provide proper wage notices and wage statements continues to result in delayed payment of all proper wages owed to Plaintiffs and Class Members. This delayed payment caused Plaintiffs and Class Members to struggle to pay bills and other debts.

49.     Further, the failure to accurately record hours of work on earnings statements, which Defendant is mandated by law to undertake on behalf of Plaintiffs and Class Members, dissuaded reasonable workers, including Plaintiffs, from raising complaints and advocating for their rights.  Defendant created these false documents with under-recorded work hours for exactly the purpose of dissuading and inhibiting employees from exercising their rights under the NYLL and the FLSA to demand their back-pay.

50.     Due to Defendant's failure to provide legally mandated notices such as earning statements and wage notices, Defendant was able to hide its wrongdoing from employees, dissuaded reasonable workers from bringing claims ending Defendant's underpayment of wages

sooner, and Defendant continues to attempt to hide its wrongdoing necessitating the current litigation. The failure to provide NYLL notices delayed Plaintiffs' and Class Members' realization of underpayments and their extent, which in turn delayed the bringing of the current litigation, and delayed payment of all proper wages owed to Plaintiffs and the Class Members.

51.    Defendant knowingly and willfully operated their business with a policy of not providing proper wage notices and wage statements, as required by the NYLL.

52.    The direct effect of understating the number of hours an employee worked is to reduce the wages that the employee is listed as having earned on their wage statements. The direct effect of this, in turn, is to reduce the employee's earnings that the employer later reports to the IRS through the employee's W-2 form, as such information is derived from the information on employees' wage statements. *See Mills v. Mills*, 2021 Minn. Dist. LEXIS 200, *5 (Minn. Dist. Ct., Anoka County, Tenth Judicial District May 20, 2021) ("Petitioner's gross annual income, based on her 2020 W-2 and paystub dated 12/24/20, is $130,321.30"); *T.F. v. N.F.*, 820 N.Y.S.2d 846, 846 (Sup. Ct., Suffolk Cty., June 22, 2006) ("In 2005 the plaintiff earned $ 133,086 as reflected on his final year paystub and W-2").[1]

53.    The effect of reporting reduced wages on an employee's W-2 is, in turn, to reduce

---

[1] It is true that the wages reported on W-2 forms are not always precisely identical to those listed on an employees' last paystub for the year. One reason for is, as the IRS explains, that "W-2 wages include: (i) the total amount of wages as defined in section 3401(a); (ii) the total amount of elective deferrals (within the meaning of section 402(g)(3)); (iii) the compensation deferred under section 457; and (iv) the amount of designated Roth contributions (as defined in section 402A)." https://www.irs.gov/pub/irs-drop/rp-19-11.pdf. However, the possibility, that wages listed on a W-2 might be affected by such considerations does not change the fact that the base wages on the W-2 are derived from paysubs. The paystub processing service *realcheckstubs* explains:  "A pay stub contains crucial information that assists in calculating W2 wages. Paystub provides gross wages, deductions, taxes withheld, and other income-related data. Individuals gather the necessary figures required for accurate W2 calculation by referring to the pay stub." https://www.realcheckstubs.com/blog/paystubs/6-steps-how-to-calculate-w-2-wages-from-paystub.

the amount of social security benefits available to the employee, as an employee's entitlement to benefits reflects how much money he or she is reported as having contributed to the social security system. *See McGauran v. Soc. Sec. Comm'n*, 2001 U.S. Dist. LEXIS 3187, *7 (N.D. Cal. March 19, 2001) ("Social security benefits are based upon the worker's earnings as reported to the [SSA] . . . [and] the worker's earnings are used to determine insured status for entitlement to retirement and to calculate cash benefit rates." (quoting Social Security Administration, Handbook § 1400 (1997)); *Coward v. Zurich Am. Ins. Co.*, 2011 U.S. Dist. LEXIS 74543, *3 (N.D. Ill. July 8, 2011) ("Under the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year.'") (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

54.     "In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation." *Chen v. Lilis 200 W. 57th Corp.*, No, 2023 U.S. Dist. LEXIS 38163, at 18, 2023 WL 2388728, at *8 (S.D.N.Y. Mar. 7, 2023). "On the other hand, 'allegations' that go 'beyond asserting a bare statutory violation and sufficiently allege concrete harm' resulting from 'the underpayment of wages' pass muster because 'monetary injury is a concrete harm sufficient for purposes of Article III standing.'" *Thompson v. Elev8 Ctr. N.Y.*, LLC, 2023 U.S. Dist. LEXIS 122504, *21 (S.D.N.Y. July 17, 2023) (quoting *Mateer v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 125017, at *4 2022 WL 2751871, at *2 (S.D.N.Y. July 14, 2022)).

55.     Here, it is clear that Defendant's failure to provide Plaintiffs and Class Members with accurate wage statements entailed "concrete, downstream consequences" involving monetary injury from both the delay in recouping payment, and in lost benefits. Had the number of hours been accurately reported for a given pay period, Defendant's automatic payroll system would have

correspondingly increased the wages due for that period, which in turn would have been reflected

in the W-2s that Defendant submitted to the IRS on behalf of Plaintiffs and Class Members. That,

in turn, would have increased Plaintiffs' and Class Members' entitlement to social security

benefits. Because the inaccuracy prevented this outcome, it constitutes an injury sufficient to

provide Plaintiffs with Article III standing.

56.     Courts agree that the misreporting of wages constitutes a concrete injury

cognizable under Article III:

> The Seventh Circuit in *Calderon* squarely addressed FICA standing. The plaintiffs
> in *Calderon* were former employees alleging the employer failed to pay
> their FICA taxes. 999 F.2d at 1105-06. The Seventh Circuit found that the plaintiffs
> lacked standing to compel the employer to pay their FICA taxes because
> "[b]enefits do not. . . depend on whether the employer actually paid the
> taxes." *Id*. at 1106. Plaintiffs could, however, enforce FICA's reporting
> requirement because it is the reporting of income that triggers benefits, and losing
> benefits is an injury under *Lujan*. *Id*. Whether the employer in *Calderon* made
> FICA payments on the plaintiffs' behalf had no bearing on the plaintiffs'
> entitlement to benefits. *Id*. "[T]he plaintiff's real interest lies in ensuring that the
> [employer] make the proper reports of their income." *Id*.

*Coward*, 2011 U.S. Dist. LEXIS 74543, at *3-4.

57.     The case at bar is somewhat different from *Coward* inasmuch as Defendant

actually underpaid Plaintiffs and Class Members, rather than merely misreporting their incomes.

But this distinction has no bearing on the question of Article III standing, since it is still the case

that "it is the reporting of income that triggers benefits, and losing benefits is an injury." *Id*.

Plaintiffs and Class Members lost benefits by virtue of how Defendant reported their incomes, and

how Defendant reported employees' incomes was the direct outcome of the inaccuracies in

employees' wage statements. That is why "Plaintiffs have standing to enforce the statutory

reporting requirements" imposed by the WTPA. *Calderon v. Witvoet*, 999 F.2d 1101, 1106 (7th

Cir. 1993).

58.     Whether or not any Class Members are presently eligible for social security benefits is legally immaterial. *See id*. ("Although only citizens and aliens residing in the United States may receive benefits, 42 U.S.C. § 402(t), plaintiffs may eventually fulfill this requirement and therefore are entitled to keep their Social Security accounts accurate.").

59.     The *Calderon* court stressed that an employee's interest in ensuring that an employer properly report the employee's income is amplified by the difficulty of persuading the government to correct errors:

> The practical difficulty is that eligibility for Social Security benefits presumptively depends on reports that employers send to the government. A worker who seeks credit for unreported income bears the burden of proof, 42 U.S.C. § 405(c)(3), (4), which will be hard to carry if the employer has not furnished the customary documentation. The government believes employers who report earnings, because these reports are costly to make--they entail paying a substantial tax. The government tends not to believe undocumented claims by employees, because these claims are essentially costless yet could establish entitlement to large pensions or disability benefits.
>
> All of this means that the plaintiffs' real interest lies in ensuring that the Witvoets make the proper reports of their income.

*Id.*

60.     Here, the problem is not merely challenging but insurmountable. Plaintiffs and Class Members cannot even attempt to have their earnings report corrected because Defendant *did* report what they actually paid Plaintiffs and Class Members. The problem, rather, is that Plaintiffs and Class Members were underpaid. Yet the ultimate effect is the same—reduced social security eligibility. Because "[u]nder the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year,'" Plaintiffs were irreversibly injured with respect to their social security benefits as soon as Defendant sent their W-2's to the IRS. *Coward*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

61.     Defendant knowingly and willfully failed to pay Plaintiffs', FLSA Collective

Plaintiffs', and Class Members' regular and overtime wages for all hours worked due to Defendant's time-shaving practices.

62.     At all relevant times, Plaintiffs, FLSA Collective Plaintiffs and Class Members regularly worked over forty (40) hours per week, but Defendant failed to pay them the proper overtime premium rates of one-and-half times of their regular hourly rates for each hour exceeding forty (40) hours per workweek, in violation of the FLSA and the NYLL.

*Plaintiff SHERMAN RIVERO's and Subclass Members' Discrimination and Retaliation Claims:*

63.     In or around January 2023, Plaintiff RIVERO was approached by Defendant's manager Santiago Alvarez, who offered Plaintiff RIVERO a job for Defendant earning $28.00 an hour.  Plaintiff RIVERO accepted this offer. When Plaintiff RIVERO appeared for his first day of work for Defendant, Mr. Alvarez told Plaintiff RIVERO, "I can hire you, but you have to give me $200.00 per week if you want to work here." Plaintiff RIVERO accepted and began to work for Defendant.

64.     Over the course of Plaintiff SHERMAN RIVERO's employment, he learned that it was only him and other Subclass Members who needed to pay manager Alvarez or his designee $200.00 each week to keep their jobs. Plaintiff SHERMAN RIVERO complied with this demand and paid the $200.00 weekly fee to manager Alvarez or his designee for months. Plaintiff RIVERO made these weekly payments over Zelle. *See* **Exhibit A**, Plaintiff RIVERO's Payments Via Zelle.

65.     Throughout Plaintiff RIVERO's employment, Plaintiff RIVERO personally observed approximately ten (10) Subclass Members handing Santiago Alvarez or his designee cash at the end of the week and/or spoke with these employees confirming they were also paying $200.00 from their checks every week, to retain their jobs.

66.     Additionally, Plaintiff VARGAS witnessed Defendant's managers' Santiago Alvarez's discriminatory practices to Subclass Members.  He witnessed Subclass Members have

to turn over a portion of their paycheck each week. Plaintiff VARGAS witnessed this discriminatory conduct happen to over twenty (20) Subclass Members throughout his employment and witnessed that employees with proper working papers were never targeted for this treatment.

67.     In or around October 2023,  Plaintiff SHERMAN RIVERO and other Subclass Members collectively refused to continue paying the $200.00 weekly fee. Plaintiff SHERMAN RIVERO and these Subclass Members were all fired by Defendant's managers shortly thereafter.

68.     Plaintiff RIVERO knows that approximately five (5) Subclass Members stopped paying managers Alavarez and his designee in or around October 2023, including Plaintiff SHERMAN RIVERO, all of whom were fired.

69.     Due to this mass termination event, approximately one week after Plaintiff RIVERO stopped working for Defendant, a safety site inspector for Defendant began calling fired Subclass Members to inquire why there were so many sudden layoffs.

70.     Defendant's safety site inspector, Kevin, whose last name is believed to be Reilly, was informed about Defendant's manager Alavarez's discriminatory scheme.  Kevin asked some fired Subclass Members to appear at one of Defendant's job sites to talk with "the big guns" regarding manager Alavarez's abuse. As requested by Defendant's site inspector Kevin, a fired employee appeared and revealed manager Alavarez's discriminatory scheme, thereby informing other managerial employees of Defendant of how Plaintiff SHERMAN RIVERO and other Subclass Members were fired for refusing to continue paying Defendant's manager Alavarez.

71.     Despite Defendant being informed of its manager Alavarez's and his designee's wrongful actions, no steps were taken by Defendant to stop this abuse, and Defendant's manager Alavarez and his designee continue to work for Defendant and discriminate against currently-employed Subclass Members.

72.    Supervisor Santiago Alvarez oversaw approximately one-quarter (1/4) of Defendant's business operations.  During his three-year tenure with Defendant, he engaged in continuous discriminatory treatment of Plaintiff SHERMAN RIVERO and the Subclass, a protected class of people, using the authority granted to him by Defendant.

73.    Supervisor Santiago Alvarez targeted non-U.S. Citizens and non-Green card holders, a vulnerable class of people protected under the NYSHRL and the NYCHRL, for disparate treatment, adverse employment actions, and retaliation.  As to the Subclass, he demanded they pay him, or his accomplice and another managerial employee, Mr. Valderrama, $200.00 a week.

74.    Defendant's managers made this request only upon those who were non-U.S. Citizens and non-Green card holders as they believed this was a group of people that would not bring suit. As to Subclass Members who failed, refused, and/or complained about providing Supervisor Santiago Alvarez with his weekly payment, those employees, like Plaintiff SHERMAN RIVERO, were terminated.

75.    Defendant was and is aware of this conduct through various managers who have been informed of Mr. Alvarez's conduct.  Despite being made aware, no action has been taken to stop this practice.

76.    Defendant went so far as to investigate the unlawful termination of multiple employees for their lawful refusal to pay Mr. Alvarez.  However, after being informed of Mr. Alvarez's unlawful discrimination and retaliation, Defendant continues to grant Mr. Alvarez the authority to discriminate against Defendant's employees.

77.    Plaintiffs retained Lee Litigation Group, PLLC to represent Plaintiffs, FLSA Collective Plaintiffs, and Class Members in this litigation, and have agreed to pay the firm a reasonable fee for its services.

**STATEMENT OF CLAIM**

**COUNT I**

**VIOLATION OF THE FAIR LABOR STANDARDS ACT**

78.     Plaintiffs repeat each and every previous allegation in this Class and Collective Action Complaint as if fully set forth herein.

79.     At all relevant times, Defendant was and continues to be an employer engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiffs and FLSA Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

80.     At all relevant times, Defendant employed Plaintiffs and FLSA Collective Plaintiffs within the meaning of the FLSA.

81.      At all relevant times, Defendant had gross annual revenues in excess of $500,000.00.

82.     At all relevant times, Defendant had a policy and practice of failing to pay wages, including overtime, to Plaintiffs and FLSA Collective Plaintiffs for all overtime hours worked due to time shaving, in violation of the FLSA.

83.     Records, if any exist, concerning the number of hours worked by Plaintiffs and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiffs and FLSA Collective Plaintiffs are in the possession and custody of Defendant. Plaintiffs intend to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, Plaintiffs will then seek leave of Court to amend this Complaint to set forth the precise amount due.

84.     Defendant knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by its failure to compensate Plaintiffs and FLSA Collective Plaintiffs for all

overtime hours, when Defendant knew or should have known such was due to Defendant's policy of time shaving.

85.     Defendant failed to properly disclose or apprise Plaintiffs and FLSA Collective Plaintiffs of their rights under the FLSA.

86.     As a direct and proximate result of Defendant's willful disregard of the FLSA, Plaintiffs and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

87.     Due to the intentional, willful and unlawful acts of Defendant, Plaintiffs and FLSA Collective Plaintiffs suffered damages in an amount not presently ascertainable of unpaid wages, including overtime, due to time shaving; plus an equal amount as liquidated damages.

88.     Plaintiffs and FLSA Collective Plaintiffs are entitled to an award of her reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

## COUNT II

## <u>VIOLATION OF THE NEW YORK LABOR LAW</u>

89.     Plaintiffs repeat each and every previous allegation in this Class and Collective Action Complaint as if fully set forth herein.

90.     At all relevant times, Plaintiffs and Class Members were employed by Defendant within the meaning of the NYLL §§ 2 and 651.

91.     At all relevant times, Defendant had a policy and practice of failing to pay Plaintiffs and Class Members all wages, including overtime, due to timeshaving, in violation of the NYLL.

92.     Defendant willfully violated the rights of Plaintiffs and Class Members by failing to pay them overtime compensation at the rate of not less than one and one-half times the regular rate of pay for each hour worked in excess of forty hours in a workweek due to time shaving.

93.     Defendant knowingly and willfully failed to provide wage and hour notices, at the date of hiring and annually thereafter, to Plaintiffs and Class Members, as required by NYLL § 195(1).

94.     Defendant knowingly and willfully failed to provide proper wage statements to Plaintiffs and Class Members with every wage payment, as required by NYLL § 195(3). Defendant provided fraudulent wage statements that failed to accurately reflect the proper compensation owed and hours worked by Plaintiffs and Class Members.

95.     Due to the Defendant's NYLL violations, Plaintiffs and Class Members are entitled to recover from Defendant their unpaid wages, including overtime, due to time shaving; damages for unreasonably delayed payments; statutory penalties; reasonable attorneys' fees; and costs and disbursements of the action.

### COUNT III

### <u>VIOLATION UNDER<br>THE NEW YORK STATE HUMAN RIGHTS LAW</u>

96.     Plaintiff SHERMAN RIVERO realleges and reavers the above allegations of this Complaint as if fully set forth herein.

97.     Plaintiff SHERMAN RIVERO and Subclass Members were employees of Defendant and qualified persons within the meaning of the NYSHRL and Defendant is a covered employer under the NYSHRL.

98.     The New York State Executive Law § 296(1) provides that:

 "[I]t shall be an unlawful discriminatory practice: (a) For an employer … because of an individual's national origin, citizenship or immigration status, [...] to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

99.     Further, New York State Executive Law § 296(7) provides that:

"[I]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate [...] against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

100.    Defendant violated Plaintiff SHERMAN RIVERO's and Subclass Members' statutorily protected rights under the NYSHRL, New York Executive Law §296, by engaging in (i) discriminatory employment practices against Plaintiff SHERMAN RIVERO and Subclass Members based on Plaintiff SHERMAN RIVERO's and Subclass Members' citizenship and immigration statuses, and (ii) retaliation against Plaintiff SHERMAN RIVERO and Subclass Members.

101.    Despite Plaintiff SHERMAN RIVERO's and Subclass Members' complaints to Defendant's management, Defendant did nothing to abate or prevent the discrimination suffered by Plaintiff SHERMAN RIVERO and Subclass Members.

102.    Further, upon Plaintiff SHERMAN RIVERO's and Subclass Members' assertion of their rights to not be discriminated against, such as by refusing to make unlawfully demanded payments to ensure continued employment, Plaintiff SHERMAN RIVERO and Subclass Members were retaliated against and fired by Defendant.

103.    Defendant's discriminatory and retaliatory conduct was intentional, malicious, willful or in reckless disregard of Plaintiff SHERMAN RIVERO's and Subclass Members' protected rights under the NYSHRL.

104.    As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff SHERMAN RIVERO and Subclass Members sustained injury, including economic damages, egregious past and future emotional distress, and the costs of bringing this action.

105.    Due to Defendant's violation under the NYSHRL, due to memberships in a

protected class, Plaintiff SHERMAN RIVERO and Subclass Members are entitled to recover from Defendant: (1) an injunction ordering Defendant to cease its discriminatory practices as described herein, (2) economic damages, (3) compensatory damages, (4) punitive damages, (5) damages for egregious emotional distress, and (6) attorneys' fees and costs.

<strong>COUNT IV</strong>

<strong><u>VIOLATION UNDER<br>THE NEW YORK CITY HUMAN RIGHTS LAW</u></strong>

106.    Plaintiff RIVERO realleges and reavers the above allegations of this Complaint as if fully set forth herein.

107.    Plaintiff SHERMAN RIVERO and Subclass Members were employees of Defendant and qualified persons within the meaning of the NYCHRL and Defendant is a covered employer under the NYCHRL.

108.    The New York City Administrative Code §8-107(1) provides that:

> "[I]t shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived [...] national origin, [...] alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

109.    Further, The New York City Administrative Code §8-107(7) provides that:

> "[I]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter"

110.    Defendant violated Plaintiff SHERMAN RIVERO's and Subclass Members' statutorily protected rights under the NYCHRL, by engaging in (i) discriminatory employment practices against Plaintiff SHERMAN RIVERO and Subclass Members based on Plaintiff SHERMAN RIVERO's and Subclass Members' protected statuses due to their citizenship,

28

alienage, and immigration statuses and/or their perceived membership in any of these categories, and (ii) retaliation against Plaintiff SHERMAN RIVERO and Subclass Members.

111.    Despite Plaintiff SHERMAN RIVERO's and Subclass Members' complaints to management, Defendant did nothing to abate or prevent the discrimination suffered by Plaintiff SHERMAN RIVERO and Subclass Members.

112.    Further, upon Plaintiff SHERMAN RIVERO's and Subclass Members' assertion of their rights to not be discriminated against, such as by refusing to make unlawfully demanded payments to ensure continued employment, Plaintiff SHERMAN RIVERO and Subclass Members were retaliated against and fired by Defendant.

113.    Defendant's conduct was intentional, malicious, willful or in reckless disregard of Plaintiff SHERMAN RIVERO's and Subclass Members' protected rights under the NYCHRL.

114.    As a result of Defendant's unlawful employment practices, Plaintiff SHERMAN RIVERO and Subclass Members sustained injury, including economic damages, egregious past and future emotional distress, and the costs of bringing this action.

115.    Due to Defendant's violation under the NYCHRL, due to membership in a protected class, Plaintiff SHERMAN RIVERO and Subclass Members are entitled to recover from Defendant (1) an injunction ordering Defendant to cease its discriminatory practices as described herein, (2) economic damages, (3) compensatory damages, (4) punitive damages, and (5) damages for egregious emotional distress.

**COUNT VI**

**<u>RETALIATION UNDER THE FAIR LABOR STANDARDS ACT</u>**

116.    Plaintiff RIVERO realleges and reavers the above allegations of this Complaint as if fully set forth herein.

117. At all relevant times, Plaintiff SHERMAN RIVERO and Subclass Members were employees of Defendant within the meaning of the FLSA, and were persons covered by and intended to benefit from the provisions of the FLSA.

118. Section 15(a)(3) of the FLSA provides that it is a violation for any person to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint [...] under or related to this Act."

119. As alleged herein, Plaintiff SHERMAN RIVERO and Subclass Members complained to Defendant and its managers regarding Defendant's invalid unpayment of wages and unsatisfactory time-shaving policies. In response to such complaints, Defendant terminated Plaintiff SHERMAN RIVERO and Subclass Members without cause.

120. Defendant's retaliatory termination was in willful disregard of the provisions of the FLSA.

121. As a direct and proximate result of Defendant's willful disregard of the FLSA, Plaintiff SHERMAN RIVERO and Subclass Members suffered damages in the form of back pay from lost earnings, compensatory damages, and punitive damages. Plaintiff SHERMAN RIVERO and Subclass Members seek judgment in an amount to be determined at trial for these damages as well as an award of liquidated damages, interests, attorneys' fees and costs, as provided under the FLSA.

**COUNT VII**

**RETALIATION UNDER THE NEW YORK LABOR LAW**

122. Plaintiff RIVERO realleges and reavers the above allegations of this Complaint as if fully set forth herein.

123. At all relevant times, Plaintiff SHERMAN RIVERO and Subclass Members were

employees of Defendant within the meaning of the NYLL, and was a person covered by and intended to benefit from the provisions of the NYLL.

124.    As alleged herein, Plaintiff SHERMAN RIVERO and Subclass Members complained to Defendant and its managers regarding Defendant's invalid unpayment of wages and unsatisfactory time-shaving policies. In response to such complaints, Defendant terminated Plaintiff SHERMAN RIVERO and Subclass Members without cause.

125.    Defendant's actions constitute a violation of Section 215 of the NYLL. In relevant part, NYLL § 215(1)(a) states:

> "No employer or his or her agent, or the officer or agent of any corporation, partnership, or limited liability company, or any other person, shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (1) because such employee has made a complaint to his or her employer, or to the commissioner or his or her authorized representative, or to the attorney general or any other person, that the employer was engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter, or any order issued by the commissioner."

126.    Defendant's conduct was in willful disregard of the provisions of the NYLL.

127.    As a direct and proximate result of Defendant's willful disregard of the NYLL, Plaintiff SHERMAN RIVERO and Subclass Members suffered damages in the form of back pay from lost earnings, compensatory damages, and punitive damages. Plaintiff SHERMAN RIVERO and Subclass Members seek judgment in an amount to be determined at trial for these damages as well as an award of liquidated damages, interests, attorneys' fees, and costs, as provided for under the NYLL.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves, FLSA Collective Plaintiffs, and Class Members, respectfully request that this Court grant the following relief:

a.  A declaratory judgment that the practices complained of herein are unlawful under the FLSA, the NYLL, the NYSHRL, and the NYCHRL;

b.  An injunction against Defendant and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies, and patterns set forth herein;

c.  An award of unpaid wages, including overtime, due to time shaving, due under the FLSA and the NYLL;

d.  An award of statutory penalties as a result of Defendant's failure to comply with wage notice and wage statement requirements;

e.  An award of liquidated and/or punitive damages as a result of Defendant's willful failure to pay proper wages, including overtime compensation, pursuant to the FLSA and the NYLL;

f.  An award of back and front pay, compensatory damages, punitive damages, liquidated damages, and all other penalties the Court deems appropriate as a result of Defendant's willful retaliatory conduct against Plaintiff SHERMAN RIVERO and Subclass Members, pursuant to the FLSA and the NYLL;

g.  An award of backpay, compensatory damages, punitive damages, and damages for egregious emotional distress, due under the NYSHRL;

h.  An award of backpay, compensatory damages, punitive damages, and damages for egregious emotional distress, due under the NYCHRL;

i.  An award of statutory penalties, prejudgment and post judgment interest, costs and expenses of this action together with reasonable attorneys' and expert fees and statutory penalties;

j.  Designation of Plaintiffs as Representatives of the FLSA Collective Plaintiffs;

k.  Designation of this action as a class action pursuant to F.R.C.P. 23;

l.  Designation of Plaintiffs as Representatives of the Class;

m.  Designation of Plaintiff SHERMAN RIVERO as Representative of the Subclass; and

n.  Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.


Dated: December 21, 2023

Respectfully submitted,
By:   */s/ C.K. Lee*_____
C.K. Lee, Esq.

**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff,*
*FLSA Collective Plaintiffs,*
*and the Class*
